PARAMOUNT BEAD CORP. *v.* UNITED STATES

No. 4617.—Invoices dated Gablonz, Czechoslovakia, May 23, 1936, etc.
Entered at New York June 5, 1936, etc.
Entry No. 850184, etc.

(Decided July 7, 1939)

*Strauss & Hedges (Eugene F. Blauvelt* of counsel) for the plaintiff.

*Webster J. Oliver,* Assistant Attorney General (*Samuel D. Spector,* special attorney), for the defendant.

SULLIVAN, Judge: These appeals were filed by the importer. The merchandise consists of so-called pull chains, described by plaintiff's counsel at the opening of the trial as follows:

They are glass articles used to attach to lighting apparatus, and they contain among other things a luminous bead, so you can locate the string in the dark.

This merchandise was appraised on the basis of the United States value, and was entered and claimed to be dutiable on the basis of the export value.

Reappraisement 114056–A involves pull chains, styles 1399 and 1405, entered respectively at 6.50 and 6.25 Czechoslovakian crowns per dozen less 2 per centum discount, plus cases and packing, and appraised at $0.3425, packed on the basis of the United States value. Reappraisement 115012–A covers the same style numbers and No. 897 all invoiced at 6 Czechoslovakian crowns per dozen, plus packing, and entered to meet advances at 34½ cents United States currency per dozen.

Reappraisement 114478–A, besides items 1399 and 1405, contains many other style numbers of pull chains. Each item is invoiced at 6 Czechoslovakian crowns per dozen, less 2 per centum discount, plus packing, and each was entered to meet advances at 34½ cents United States currency per dozen.

Reappraisements 114631–A and 115052–A do not contain pull chains 1399 and 1405, but other item numbers. Each item was invoiced at 6 Czechoslovakian crowns per dozen, less 2 per centum discount, plus case, and entered to meet advances at 34½ cents United States currency per dozen.

In reappraisement 116338–A the merchandise covers various styles of pull chains, including items 1399 and 1405, invoiced in one case at 6 Czechoslovakian crowns per dozen and as to the other items at 5.90 Czechoslovakian crowns per dozen, less 2 per centum discount, plus cases. They were all entered to meet advances at 34½ cents per dozen United States currency.

In the duress cases the merchandise was appraised as entered.

In the initial case the merchandise was invoiced at Gablonz on May 23, 1936. The other invoices were made in the same year at Gablonz between June 27 and August 8.

At the trial there were two witnesses on behalf of the plaintiff.

Mr. Yokel testified he is president of the plaintiff corporation, orders all the merchandise for the plaintiff, and goes abroad on buying trips; that he purchased the merchandise in question in the

Spring of 1936. He proved samples of the merchandise, which were received in evidence as Collective Exhibit 1.

A sample of item 895 was introduced in evidence as Illustrative Exhibit A. It is without a cord. As imported the articles had cords.

Illustrative Exhibit B is a sample of item 951 without a cord. It was imported with a cord.

Illustrative Exhibit C is a sample of item 897. As imported it had a cord.

Various illustrations showing this merchandise as imported with cords were received in evidence as Illustrative Exhibit D.

The witness testified that there are other items not represented by the exhibits, which are similar to the samples introduced, differing only in design or in the number of beads.

The witness then testified that in the Spring of 1936 he visited Gablonz, Morganstern, and different little towns where these or similar items are made; that such towns are all in the vicinity of Gablonz; that he has been going to that section of Czechoslovakia for 19 years; that Gablonz is the principal market for pull chains of this type; that in the Spring of 1936 he visited four manufacturers for the purpose of purchasing pull chains, and bought from them; and these manufacturers had offices and in some cases showcases where these pull chains were displayed, some with prices attached and others without; that he found in the Spring of 1936 all the pull chains covered by these appeals to reappraisement were freely offered for sale "at the same prices they offered them to me at"; that he eventually paid such prices, and they are the prices at which these pull chains are invoiced; that he did not have any agreement with any of these manufacturers that particular items were to be reserved exclusively for him; that competitors of his in the United States purchased similar merchandise; that he made inquiries during the period in which he has been importing articles of this kind as to whether or not they were sold in Czechoslovakia for use there or to other countries, and he found "there was very little use for these items in any other country but America"; that they were not sold to any other country than the United States, nor for home use.

The witness further testified that when he returned from his trip abroad in the Spring of 1936 he brought with him a sample line of the merchandise which he purchased, showed the line to the examiners involved, discussed value questions with them, and showed them what the merchandise cost; that the prices at which he entered, the invoice prices, are the prices he actually paid, and those prices ranged from 5 crowns 90 to 6 crowns 50 per dozen.

On cross-examination the witness testified on his visit abroad he went from twenty-five to thirty or more towns in the Gablonz district, looking for articles suitable for his company to sell.

The witness testified on cross-examination that when he originally purchased these articles he did not give any bonuses or drawings, but purchased them direct from the samples he saw abroad in the places of the manufacturers of these articles; that sometimes he would try to have them "changed a little" to modify the prices as follows:

For instance, if he would submit something to me, and it would cost 7 crowns, that would be a little too high for the price range to retail for 10 cents, so I would change the shape of a bead or leave out a bead, or make a little change on the item.

He further testified that he purchased these articles direct from the manufacturer, Hubner & Stracke, and not from Edward Krause, who is a commissionaire; that Krause "receives goods, packs them, and makes out the invoices, pays the manufacturer, and I pay him"; that he always purchased through a commissionaire "because the manufacturer would not have the facilities for packing and invoicing."

Plaintiff's witness Gerstle testified he is in charge of several departments for Hirsch Sons, who import merchandise. The witness was shown the exhibits and testified that in 1936 his company imported merchandise of that character without cords; that he placed the cords therein after importation; that the merchandise he imported was made in the Gablonz district. He testified as to the method he employed in purchasing this merchandise in Gablonz in 1936 as follows:

He would send a request in December [1935] for new samples. * * * To our office in Gablonz. * * * Our man over there would go around to the various manufacturers and ask them to please submit new samples. In some cases the samples were not ready, and the manufacturer there was requested to submit sketches or plaster models, and they were sent to us over here, and we would make a selection from these sketches, plaster models and samples. * * * The prices were not always definite, but they were within 10 percent of the final prices.

He testified that in December 1935, January 1936, "and so on" he had samples of pull chains similar to those before the court submitted to him; that he did not have any arrangement or agreement with any manufacturers that they would reserve exclusive numbers for him; that "such an agreement would not have been worth anything"; that he purchased goods of this character from Hubner & Stracke; that he "cannot absolutely say" whether he purchased goods of this character from Wilhelm Schuster at that time; that he "always had received samples from them, whether we purchased I do not know;" that these items of a similar character were so similar to those before the court that he would say to a layman or someone who did not know, that they were the same thing; that "the colors were probably the same; the character of the beads were the same, but some beads may have been smaller, some used upside down, and differences of that character";

that he thought his price range for these goods was between 5 and 6 crowns, packing added; that he is familiar with the merchandise sold by the Paramount Bead Co.; that they are competitors of his; that he has seen the pull chains offered by the Paramount Bead Co. to customers in this country; that they competed with pull chains offered by Hirsch, and were commercially interchangeable therewith.

On cross-examination he testified he has been in the Gablonz district; that there is a "chance agreement" with the manufacturers in the Gablonz district and the importers or purchasers to have distinctive styles reserved for each purchaser, "but the performance is not what it should be"; that "if you give the manufacturer enough business that he feels he cannot produce any more he will reserve it for you" "otherwise he will not"; that he purchased these articles through a commissionaire, who represented other manufacturers of glassware, "but did principally business with us"; that even a so-called reserved item is sold to the United States to everybody who wants to buy it; that "anybody can go and actually buy numbers that are supposed to be reserved," or agreed to be reserved.

Counsel informed the witness that the price range of the articles at bar was from 5.90 to 6.50 crowns per dozen. The witness thought his price range was a little less, or between 5 and 6.50 crowns per dozen, there being a difference given for the cord, his articles being without the cord at that time.

Plaintiff then introduced in evidence an affidavit made by Artur Stracke of Hubner & Stracke of Gablonz, dated March 26, 1937. Hubner & Stracke are the exporters of the merchandise in question. This document with translation is marked Exhibit 2. Mr. Stracke states therein as follows:

The undersigned herewith affirms in lieu of oath that the Pull Chains No. 1399, 1405, 1458, 1456, 1468, 1463, 1464, * * * are not reserved for the Paramount Bead Corporation, * * * and I, as manufacturer of the above mentioned articles, am willing at all times to sell to any customer, whether in the United States, Great Britain, France, Czechoslovakia, or any other country, any quantity of these articles at the same prices as those charged to the Paramount Bead Corporation.

The affidavit of Wilhelm Schuster and translation was then received in evidence as Exhibit 3. This affidavit is to the effect that items 895, 897, and 951 supplied to Ed. Krause, Gablonz, are not reserved to the Paramount Bead Co., and that deponent is "at all times willing to sell to any customer whether in the United States, Great Britain, France, or any other country, any quantity of these articles at the same prices as those charged to the Paramount Bead Corporation."

Plaintiff then introduced in evidence as Exhibit 4 the affidavits of Wilhelm Schuster and Artur Stracke.

Wilhelm Schuster states he is the owner of the firm of Wilhelm Schuster, Gablonz, who manufacture glass articles including pull chains, and continues as follows:

* * * that between June 5th and August 28th, 1936, they [Schuster] sold and exported to the Paramount Bead Corporation of New York, U. S. A., certain so-called pull chains * * * identified on the invoices as items 951, 895, 897, assorted colors; that these item numbers and the merchandise represented thereby. are from the regular sample line exposed for sale to all purchasers of good credit in the usual wholesale quantities on or about the dates of exportation referred to above; that although items 951, 895, 897, assorted colors, were offered for sale to all purchasers on or about the dates of exportation above referred to, these particular items and qualities were only purchased by Paramount Bead Corporation of New York for shipment to the United States at the prices indicated on the invoices * * * that other item numbers * * * similar in design, construction, and use, but slightly different in size, and a better quality, are also contained in the sample line offered for sale to all purchasers of good credit in the usual wholesale quantities; that these latter better quality articles * * * were purchased by. and exported to other American firms on or about the dates of exportation referred to above, but at higher prices than those charged to Paramount Bead Corporation for the cheaper quality * * * that Wilhelm Schuster was willing to sell on or about the dates of exportation referred to and has been willing to sell at all times since items 951, 895, 897 purchased by Paramount Bead Corporation to any and all purchasers of good credit, in usual wholesale quantities, at the same prices as sold to Paramount Bead Corporation * * *, that so far as he knows there is no demand for this kind of merchandise for home consumption in Czechoslovakia or in any other country than the United States.

So far as pertinent the affidavit of Artur Stracke is as follows:

* * . * That he is the owner of the firm Hubner & Stracke, Gablonz * * * manufacturers of glass articles among which are certain pull chains; * * * that between June 5th and August 28th, 1936, they sold and exported to the Paramount Bead Corporation of New York, U. S. A., certain socalled pull chains * * * items 1399, 1405, 1454/58, 1460, assorted colors; that these item numbers and the merchandise represented thereby are from the regular sample line exposed for sale to all purchasers of good credit in the usual wholesale quantities on or about the dates of exportation referred to above; that although * * * offered for sale to all purchasers on or about the dates of exportation above referred to, these particular items and qualities were only purchased by Paramount Bead Corporation of New York for shipment to the United States at the prices indicated on the invoices covered by the importations identified by the dates mentioned above * * *

Deponent then refers to other items of similar design, construction, and use, but better quality offered for sale to all purchasers and sold to American firms at higher prices than those charged to Paramount Bead Co. for the cheaper quality items, and continues as follows:

* * * that Hubner & Stracke was willing to sell on or about the dates of exportation referred to and has been willing to sell at all times since items 1399, 1405, 1454/58, 1460 purchased by Paramount Bead Corporation to any and all purchasers of good credit, in usual wholesale quantities, at the same prices as sold to Paramount Bead Corporation * * * that so far as he knows there is no demand for this kind of merchandise for home consumption in Czechoslovakia or in any country than the United States.

This closed plaintiff's case.

The Government introduced in evidence the report of Hugo Wallenfels, dated February 17, 1936. This date is prior to the shipment of any of this merchandise. It was received as Exhibit 5.

Mr. Wallenfels is the representative of the Treasury Department at Vienna, Austria. He states he visited Hubner & Stracke at Gablonz on January 20, 1936, and obtained the information set forth in the report from Mr. Stracke, partner, and from books and records submitted by him. Referring to items 1399, 1405, and 1438, being some of the items covered by these reappraisements, he states neither they, "nor merchandise similar under T. D. 46788, were offered or sold in the principal market at Gablonz either for home consumption in Czechoslovakia or for export, by this maker."

(2) The only relationship between this manufacturer and the shipper is that of seller and commission agent. The importer cannot buy from the manufacturer because the latter is not organized for export. The Exporters' Gremium at Gablonz will not permit Gablonz manufacturers to export directly. * * *

(3) The only relationship between the shipper (Ed. Krause) and the importer is that of commission agent and purchaser.

(4) The merchandise is restricted to Edward Krause by this manufacturer and not offered or sold to anyone else.

(5) This manufacturer, said Mr. Stracke, had no formal records of costs or calculations. * * *

Then follows a table of calculations of selling prices of these three items, 1399, 1405, and 1438, including overhead and profit, showing selling prices of 1399, 6.50 koruny; 1405, 6.25 koruny; and 1438, 6.25 koruny.

It will be observed that in reappraisement 116338–A the invoice price of 1399 and 1405 is stated as 6 Czechoslovakian crowns and in reappraisement 114478–A for item 1438, 6 Czechoslovakian crowns. Other reappraisements have this same invoice price for these three items. In reappraisement 114056–A, however, the invoice price of 1399 is 6.50 Czechoslovakian crowns, and 1405, 6.25.

It will be seen from the foregoing that there is no home market or foreign value for the merchandise in question. The question is therefore, is the export value or the United States value the proper basis by which to calculate the market value of the merchandise in question? I am satisfied that the relationship between the manufacturer and the importer was that of seller and purchaser, and that Edward Krause was merely a commissionaire.

"Export value" is defined in section 402 (d) of the Tariff Act of 1930 as follows:

* * * The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is *freely offered* for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale

quantities and in the ordinary course of trade, for exportation to the United States * * *. [Italics ours.]

That this merchandise was freely offered for sale in Gablonz is evidenced by the testimony of Mr. Yokel and the affidavits of Wilhelm Schuster and Artur Stracke.

I am of opinion, therefore, that there was an export value for this merchandise at the time of its exportation to the United States.

The invoice prices of this merchandise appear to be the export value thereof, except as to items 1399, 1405, and 1438, in reappraisements other than 114056–A. In that reappraisement the invoice prices of 1399 and 1405 are stated as 6.50 and 6.25 Czechoslovakian crowns, respectively. These are the figures stated by the special agent in his table of costs. He also states that the selling price of item 1438 is 6.25 Czechoslovakian crowns. In reappraisements 114631–A, 114478–A, and 115052–A, the invoice prices of items 1399, 1405, and 1438 are stated as 6 Czechoslovakian crowns. The same is true as to items 1399 and 1405 in reappraisements 115012–A and 116338–A.

I do not find any reason stated why the invoiced prices in some of the reappraisements, as to items 1399, 1405, and 1438, are lower for these items than as shown by the special agent in Exhibit 5, and as invoiced in reappraisement 114056–A; but the evidence satisfactorily shows that the invoiced prices are the proper dutiable export values as to all the items with the exception of items 1399, 1405, and 1438 in reappraisements other than 114056–A.

I therefore hold that there is an export value for the merchandise at bar, and that such export value is the invoiced values with the exception of items 1399, 1405, and 1438 so far as they appear in reappraisements other than 114056–A; and that as to those reappraisements the export value of item 1399 is 6.50 Czechoslovakian crowns; item 1405, 6.25 Czechoslovakian crowns; and item 1438, 6.25 Czechoslovakian crowns; less a discount of 2 per centum, cases and packing added.

Judgment accordingly.